COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-494-CR

 

 

FRANKIE DEAN PAIR, JR.                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 97TH
DISTRICT COURT OF MONTAGUE COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

 

I.  Introduction

Pursuant to a plea bargain, Appellant Frankie
Dean Pair, Jr. pleaded guilty to the offense of manufacture of more than 400
grams of methamphetamine, and the trial court sentenced him to five years=
confinement.  In two points, Pair
complains that the trial court erred by denying his pretrial motion to
suppress. We will affirm.

 








II.  Factual Background[1]

Around 10:00 p.m. on February 28, 2003, deputies
with the Montague County Sheriff=s
Department attempted to serve a felony arrest warrant on Kathy McWilliams in
Sunset, Texas.  Deputy Dwayne Schelsteder
and two other deputies approached a single-story house and knocked on the front
door, but no one answered.  A strong odor
of ether emanated from the interior of the house, and the deputies thought they
heard somethingCa person or an animalCmoving
around inside of the residence.  The
deputies then walked around to the rear of the house and knocked on the back
door; again, no one answered. 








Concerned with the odor emanating from the house,
one of the deputies contacted Deputy Dan Jordan, a lieutenant investigator for
the sheriff=s department.  Deputy Jordan instructed the deputies to
watch the house and make sure nobody left until he arrived.  Deputy Jordan contacted Department of Public
Safety Trooper Marshall Thomas and informed him that while attempting to serve
an arrest warrant, deputies noticed a strong either-like odor commonly
associated with methamphetamine coming from inside of the residence, that no
one answered the door despite their repeated knocks, and that people were
moving around inside.  Another deputy had
noticed Aa
pitcher of white powder on the back porch@ that
was thought to contain methamphetamine or methamphetamine by-products.  Familiar with the residence because of
information previously received that a methamphetamine lab possibly existed
there, Trooper Thomas advised Deputy Jordan and the other officers to enter the
residence in order to prevent the destruction of any possible evidence of drug
activity.  Trooper Thomas further advised
the deputies to remove the occupants from inside the house but to not perform a
search of the premises.   

Deputy Jordan arrived at the residence with
additional officers and entered the house. 
Although deputies did not search the house, those persons discovered
inside were taken outside, patted down for weapons, handcuffed, and placed in
patrol cars.  One individual was
discovered in a bathroom pouring liquid into the toilet; officers detained him
before he could flush the toilet.  Pair
was among those removed from the house.  








Trooper Thomas obtained a search warrant in the
meantime and arrived at the residence thereafter.  Officers searched the residence and collected
the white powder substance in the pitcher located on the back porch, the liquid
from the toilet, and three syringesCone
found in a kitchen drawer, one found in a coat on the couch, and another found
on top of the ovenCcontaining a clear liquid.  Officers also found pseudoephedrine pills
still in blister packets, clear liquid in an acetone container in the kitchen,
and a baggie of white powder on top of the oven.  Subsequent analysis of the seized items
showed that the white powdery substance in the pitcher found on the back porch,
two of the syringes, the clear liquid from the toilet, and the baggie holding
white powder all contained methamphetamine. 

In his motion to suppress evidence, Pair argued
that both Athe actions of the Texas
Department of Public Safety Narcotics Service@ and his
warrantless arrest violated his rights under the Fourth, Fifth, Sixth, and
Fourteenth Amendments to the United States Constitution and Article I, Section
9 of the Texas Constitution.  Deputy
Schelsteder and Trooper Thomas were the only two witnesses to testify at Pair=s
suppression hearing.  The trial court
signed an order denying Pair=s motion
to suppress on October 5, 2004; it made no findings of fact or conclusions of
law.  Pair appeals from this pretrial
ruling.

III.  Search, Steelman, and Admissibility of
Evidence

In his first point, Pair argues that the trial
court improperly denied his motion to suppress because he was illegally
arrested.  The State, however, maintains
that the trial court correctly denied Pair=s motion
to suppress because the officers= initial
entry and subsequent search of the residence was lawful. 

 








A. 
Standard of Review

We review a trial court=s ruling
on a motion to suppress evidence under a bifurcated standard of review.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  At a suppression
hearing, the trial judge is the sole trier of fact and judge of the credibility
of the witnesses and the weight to be given to their testimony.  State v. Ross, 32 S.W.3d 853, 855
(Tex. Crim. App. 2000).  Therefore, we
give almost total deference to the trial court=s ruling
on (1) questions of historical fact and (2) application-of-law-to-fact
questions that turn on an evaluation of credibility and demeanor.  Johnson v. State, 68 S.W.3d 644,
652-53 (Tex. Crim. App. 2002); Best, 118 S.W.3d at 861-62.  However, we review de novo a trial court=s
rulings on mixed questions of law and fact if they do not turn on the
credibility and demeanor of witnesses.  Johnson,
68 S.W.3d at 652-53.  








Where the trial court denies the motion and does
not file findings of historical fact, as in this case, we view the evidence in
the light most favorable to the trial court=s ruling
and assume that the ruling is based upon implicit findings of fact supported by
the record.  Carmouche, 10 S.W.3d
at 327-28.  Furthermore, we will uphold
the trial judge=s decision so long as it is
correct under any theory of law.  Ross,
32 S.W.3d at 855-56.

B.  Evidence Derived From Lawful Warrantless
Entry and Subsequent          Search
Admissible Under Article 38.23(a)

 








A non-consensual police entry into a residential
unit constitutes a search under Katz v. United States, 389 U.S. 347, 88
S. Ct. 507 (1967).  McNairy v. State,
835 S.W.2d 101, 106 (Tex. Crim. App. 1991). 
A warrantless search is justified when the State shows (1) that probable
cause existed at the time the search was made and (2) that exigent
circumstances existed which made the procuring of a warrant impracticable.  Estrada v. State, 154 S.W.3d 604, 610
(Tex. Crim. App. 2005); McNairy, 835 S.W.2d at 106.  Probable cause to search a residence exists
when reasonably trustworthy facts and circumstances within the knowledge of the
officer on the scene would lead a man of reasonable prudence to believe that
the instrumentality of a crime or evidence of a crime will be found.  McNairy, 835 S.W.2d at 106.  Exigent circumstances exist allowing a
warrantless entry into a house when officers are justified in believing that
evidence or contraband will be destroyed before they can obtain a search warrant.  Id. at 107.  Several factors are used in analyzing whether
officers could have reasonably concluded that evidence would be destroyed or
removed before they could obtain a search warrant:  (1) the degree of urgency involved and the
amount of time necessary to obtain a warrant; (2) a reasonable belief that the
contraband is about to be removed; (3) the possibility of danger to the
officers guarding the site of the contraband while a search warrant is sought;
(4) information indicating that the possessors of the contraband are aware that
the police are on their trail; and (5) the ready destructibility of the
contraband and knowledge that efforts to dispose of narcotics and to escape are
characteristic behavior of persons engaged in the narcotics traffic.  Id.








Applying the aforementioned principles to the
instant case, testimony at the motion to suppress hearing showed that as Deputy
Schelsteder stood at the front door he smelled a strong odor, which he believed
to be ether, emanating from the house. 
Based on his knowledge and experience as a deputy, he recognized the
odor as one commonly associated with the manufacture of methamphetamine.  See Estrada, 154 S.W.3d at 608-09 (AThough
it is clear that odor alone may not justify a warrantless search,. . .
[t]he >odor of
an illegal substance= may be a factor that police
officers use in determining whether there is probable cause that an
offense has been or is being committed.@)
(emphasis added).  In addition to the
odor, Deputy Schelsteder further testified that he thought he heard movement
inside the house although he was not sure if it was a person or an animal.  Trooper Thomas was in contact with Deputy
Jordan.  Trooper Thomas testified that he
had previously conducted surveillance on the house because he had received
information that a methamphetamine lab was possibly operating inside.  He testified that Deputy Jordan informed him
that Ain
addition to smelling the chemical odor, they [the deputies] could hear people
inside the residence moving around, kind of like they were running, maybe
trying to hide.@ 
Trooper Thomas also learned from Deputy Jordan that a deputy on the
scene had observed a Apitcher of a white powder on the
back porch consisting of methamphetamine or by-products of methamphetamine.@  Viewing the evidence in the light most
favorable to the trial court=s ruling
and considering the facts and circumstances available to the officers prior to the
entry and considering the reasonable inferences that could be drawn from that
information, we hold that probable cause existed to enter the residence.  McNairy, 835 S.W.2d at 106.








Having determined that probable cause existed, we
next examine the record to determine whether exigent circumstances existed to
justify the warrantless entry.  Deputies
knocked on the front and back doors of the house, but no one answered; however,
they thought they heard people moving around inside.  Deputy Schelsteder testified that he and the
other officers entered the residence Ato make
sure no evidence was destroyed.@  Indeed, Trooper Thomas testified that he Aadvised
[Deputy] Jordan to ask officers to go ahead and make entry for officer safety
to make sure that no one was injured and to prevent destruction of any other
evidence in the residence.@  Trooper Thomas secured a search warrant in
the meantime, and officers did not conduct a search of the residence until the
search warrant arrived.  Accordingly, we
hold that exigent circumstances existed justifying entry into the house because
a warrant could not be obtained immediately, because officers heard people
moving around within the house, and because any contraband inside the residenceCallegedly
methamphetamineCwas readily destructible.  See id. at 107.  

Pair argues that the trial court erred by denying
his motion to suppress because his arrest was unlawful.  Following his lead and citing State v.
Steelman, 93 S.W.3d 102 (Tex. Crim. App. 2002), the dissent concludes that A[b]ecause
the police could not have lawfully arrested Appellant under any exception to
the warrant requirement, >they had no authority (under
article 14.05) to enter the residence without a warrant and conduct a search,
and any evidence seized as a result of those illegalities was tainted and
subject to suppression.=@  Thus, Pair and the dissent contend that the
evidence gathered from the house should have been suppressed because Pair was
illegally arrested under Texas Code of Criminal Procedure Article 14.  We disagree for two reasons: first, the facts
and thus applicable law of this case are distinguishable from those in Steelman,
and second, the seized evidence is admissible pursuant to article 38.23(a) of
the code of criminal procedure.








The dissent suggests that the facts of this case
are Asimilar@ to
those in Steelman, and it proceeds to cite portions of that opinion at
length.  This case, however, is
distinguishable in significant ways. 
First, the officers in Steelman entered the residence for the
purpose of effecting a warrantless arrest.  Id. at 104; see also Parker v.
State, No. 07-02-0354-CR, 2005 WL 66942, at *2-3 (Tex. App.CAmarillo
Jan. 12, 2005, pet. granted) (A[T]he
dispositive issue [in Steelman] was whether probable cause existed to
justify a warrantless arrest of Steelman in his home.@); Effler
v. State, 115 S.W.3d 696, 699 (Tex. App.CEastland
2003, pet. ref=d) (A[T]he
officers in Steelman entered the home for the purpose of effecting a
warrantless arrest of its occupants.@).  The court stated,

Ian opened the door,
stepped outside, and closed the door behind him.  When Ian opened the door, the officers
smelled the odor of burnt marijuana.  The
officers asked Ian for identification. 
Ian informed the officers that he would have to retrieve his
identification from inside the house.  He
then opened the door, walked back through it, and attempted to close it behind
him.  At that point, one of the officers
placed his foot in the doorway and prevented Ian from closing the door.  The officers then burst through the
doorway, handcuffed all of the occupants, including Leo, and placed them all
under arrest.

 

At that point, the officers contacted narcotics agent David Varner.  Varner arrived at the scene and smelled
marijuana inside the residence.  After
asking for, but not receiving, appellees= consent to search the residence, Varner left
to obtain a search warrant.

 








Steelman, 93 S.W.3d at 104 (emphasis added).  Here, officers did not (1) enter the
residence in order to arrest the inhabitants because they smelled an odor
commonly associated with the manufacture of methamphetamine and then (2) seek a
warrant to search the residence.  Rather,
here officers entered the residence with probable cause for the purpose of
preventing the destruction of contraband pending arrival of the search
warrant.  See Estrada, 154 S.W.3d
at 608 (AOur
holding in Steelman does not support the proposition that marijuana
odors alone cannot constitute probable cause for a warrantless search.  Rather, Steelman holds that the mere
odor of marijuana does not constitute the probable cause necessary for police to
arrest someone for committing an offense in their presence.@)
(emphasis added).  Second, in Steelman,
unlike in this case, there is no assertion or discussion of exigent
circumstances necessitating the officers= entry
into the residence.  Thus, the Steelman
facts are distinguishable from the facts of this case.








Moreover, Pair is appealing the trial court=s denial
of his motion to suppress illegally obtained evidence.  Article 38.23(a) of the Texas Code of
Criminal Procedure provides that evidence Aobtained
by an officer or other person in violation of any provisions of the
Constitution or laws of the State of Texas, or of the Constitution or laws of
the United States of America@ shall
not be admitted in evidence against the accused on the trial of any criminal
case.  Tex.
Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).  As discussed above, a warrantless entry into
a residence is a search.  We determined
that officers had probable cause to enter the residence and that exigent
circumstances existed.  Consequently, the
warrantless entry was valid and justified. 
After entering the residence and removing those inside, officers did not
proceed to conduct a search and seizure of items in the house.  Rather, they postponed any further search
until after a warrant had been acquired. After the search warrant arrived, the
officers proceeded to search the residence and found the contraband that is at
issue in the motion to suppress.

Throughout his appellate brief, Pair attempts to
confuse the issues.  He wants to prevent
the evidence seized by officers from the residence, pursuant to a valid search
warrant, from being used against him.[2]  But he tries to achieve this by arguing a Awarrantless
arrest.@  This he cannot do.  See Steelman, 93 S.W.3d at 123
(Hervey, J. dissenting). 








Accordingly, we hold that the evidence Pair
sought to suppress was not obtained in violation of article 38.23(a)Cit was
obtained pursuant to a valid search warrant after officers having probable
cause entered the house to prevent the destruction of contraband.  That Pair may have been illegally arrestedCwhich we
do not decideChas no effect upon and is of no
consequence to the subsequent lawful search of the residence, the seizure of
contraband from the residence, and the admissibility of that evidence.  Johnson v. State, 871 S.W.2d 744,
749-51 (Tex. Crim. App. 1994) (AIf the
evidence is not >obtained= in
violation of the law, then its admission into evidence is not in contravention
of Art. 38.23.@).  The trial judge=s
decision was correct under this theory of law. 
See Ross, 32 S.W.3d at 855-56. 
Therefore, the trial court did not err by denying Pair=s motion
to suppress evidence.  We overrule Pair=s first
point.

IV.  Search Warrant Validity

In his second point, Pair argues that the search
warrant executed by the officers was invalid to authorize a search of the
residence because the credibility of those individuals reporting information to
the affiant cannot be determined, because part of the information relied on by
the affiant is stale, and because the affidavit fails to name the deputies
providing some of the information. 








In determining whether a probable cause affidavit
sufficiently supports a search warrant, the trial court examines the totality
of the circumstances and gives great deference to the magistrate=s
decision to issue the warrant.[3]  Ramos v. State, 934 S.W.2d 358, 362-63
(Tex. Crim. App. 1996), cert. denied, 520 U.S. 1198 (1997); State v.
Duncan, 72 S.W.3d 803, 805 (Tex. App.CFort
Worth 2002, pet. dism=d).  Probable cause exists when the magistrate has
a substantial basis for concluding that a search would uncover evidence of
wrongdoing.  Illinois v. Gates,
462 U.S. 213, 236-37, 103 S. Ct. 2317, 2331 (1983).  Although we examine only the four corners of
the affidavit to determine whether probable cause exists, a magistrate may draw
reasonable inferences from the affidavit and must interpret the affidavit in a
common sense and realistic manner when determining whether probable cause
exists to issue the warrant.  Ramos,
934 S.W.2d at 362-63; State v. Stone, 137 S.W.3d 167, 175 (Tex. App.CHouston
[1st Dist.] 2004, pet. ref=d); Duncan,
72 S.W.3d at 805-06.








The allegations in the affidavit are sufficient
if they would Ajustify a conclusion that the
object of the search is probably on the premises.@  Ramos, 934 S.W.2d at 363.  While information from an unnamed informant
alone does not establish probable cause, the informant=s tip
combined with independent police investigation may provide a substantial basis
for the probable cause finding.  Janecka
v. State, 739 S.W.2d 813, 825 (Tex. Crim. App. 1987).  A police officer is presumed to be reliable
and no special showings are required.  Davis
v. State, 165 S.W.3d 393, 405 n.3 (Tex. App.CFort
Worth 2005, pet. granted) (citing United States v. Ventresca, 380 U.S.
102, 85 S. Ct. 741 (1965)); Barton v. State, 962 S.W.2d 132, 143 (Tex.
App.CBeaumont
1997, pet. ref=d).

Probable cause ceases to exist when it is no
longer reasonable to presume that items once located in a specified place are
still there.  Stone, 137 S.W.3d at
178.  When the affidavit recites facts
indicating activity of a protracted and continuous nature, the passage of time
between the occurrence of events set out in the affidavit and the time the
search warrant was issued becomes less significant.  Id. 








The affidavit, dated March 1, 2003, states that
on October 17, 2002, Deputy Jordan advised Trooper Thomas, the affiant, that he
had received information from a confidential informant that the occupants of
201 Campbell StreetCthe searched residenceCwere
believed to be manufacturing methamphetamine. 
On December 15, 2002, Montague County deputies attempted to serve a
warrant on a subject at the residence and smelled a strong odor of ether coming
from about the residence.  As the
affidavit states, AThe Deputies knew that ether is
a known ingredient in the manufacture of Methamphetamine and the owner of the
residence is associated with known drug dealers and users.@  The affidavit continues,

On this date [the date the affidavit was executedCMarch 1,
2003], Deputies with the Montague County Sheriff=s Office
went to the residence in order to serve a felony arrest warrant on a subject
who was reported to be inside.  While at
the residence, Deputies smelled a strong chemical odor that they know, due to
their experience and training as law enforcement officers, to be associated
with the Manufacture of Methamphetamine.








The information Trooper Thomas received from
fellow officers is presumed credible.  See
Barton, 962 S.W.2d at 143.  Moreover,
the information supplied by the confidential informant does not stand on its
own; it was corroborated by deputies just a few hours before the warrant was
signed.  Although a portion of the facts
set out to establish probable cause relates information acquired in late 2002,
the affidavit states that deputies attempting to serve an arrest warrant at the
residence on February 28, 2003 once again smelled a chemical odor that they
associated with the manufacture of methamphetamine.  Thus, because the affidavit states facts
indicating activity of a protracted and continuous nature, we give less
significance to the passage of time between late 2002 and the day the warrant
was signed and conclude that it was reasonable to assume that items located at
the residenceCmethamphetamineCwere
still there.  See Stone, 137
S.W.3d at 178.  Finally, nothing in the
Texas Code of Criminal Procedure requires the affidavit to provide the names of
the officers supplying information.  See
Tex. Code Crim. Proc. Ann.
art. 18.01(b), (c), (d) (Vernon Supp. 2005). 
Accordingly, we overrule Pair=s second
point.[4]

V.  Conclusion

Having overruled both of Pair=s
points, we affirm the trial court=s
judgment.

 

 

SUE
WALKER

JUSTICE

 

PANEL F:    DAUPHINOT, WALKER, and MCCOY, JJ.

 

DAUPHINOT, J. filed a
dissenting opinion.

 

PUBLISH

 

DELIVERED: January 5,
2006

 

 

 

 

 

 

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-494-CR

 

 

FRANKIE
DEAN PAIR, JR.                                                     APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

          FROM THE 97TH DISTRICT
COURT  OF MONTAGUE COUNTY

 

                                              ------------

 

                                   DISSENTING OPINION

 

                                              ------------








In two points, Appellant complains that the trial
court erred by failing to suppress improperly seized evidence and that the
search and arrest warrant, obtained and executed after the search, was invalid
and did not attenuate the taint of illegality. 
Because I would hold that the trial court erred by failing to suppress
the improperly seized evidence, that the search and arrest warrant was invalid,
and that the warrant failed to attenuate the taint of the illegal search and
seizure, I would reverse the trial court=s
judgment and remand the case to the trial court for a new trial without the
improperly obtained evidence.

I must therefore respectfully dissent from the majority=s thoughtful
opinion.  Additionally, I must
respectfully dissent from the majority=s
accusing Appellant of Aattempt[ing] to confuse the
issues.@  Appellant has an absolute right to challenge
both the warrantless entry into the house and the validity of the warrant.    

Relevant Facts

In the case before us, the evidence shows that
Officers Schelsteder, White, and Gillespie went to the address on Campbell
Street to serve an arrest warrant on Kathy McWilliams.  They smelled ether.  No one came to the door, although they heard
either people or an animal moving inside. 
The record does not reflect that anyone left or attempted to leave the
house with contraband.  Nor was anyone
seen attempting to destroy drugs. 
Indeed, no one saw any drugs inside the house.








Officers Gillespie and Schelsteder walked to the
rear of the house.  They knocked on the
back door.  No one responded.  Officer Schelsteder contacted Officer
Jordan.  When Officer Jordan and some
other officers arrived at the house, they entered the house without a
warrant.  Officer Schelsteder testified
that they entered A[t]o secure in case any evidence
could be C to make sure no evidence was
destroyed.@ 
He denied searching the interior of the house but did admit to seizing
the persons inside, handcuffing them, searching them, and putting them in squad
cars. 

Officer Jordan and other officers went back into
town to get a warrant.  After the warrant
arrived, the officers searched the house. 


Officer Thomas was a sergeant with the narcotics
service of the Department of Public Safety (ADPS@).  Officer Thomas had been conducting an
investigation regarding a clandestine methamphetamine lab at the house.  Officer Jordan contacted Officer Thomas.  Officer Thomas claimed that Officer Jordan
had told him that he had heard people inside the house trying to hide and that
one person had come out to say that there was no one else in the house.  Officer Thomas also claimed that before
securing the warrant, AOne deputy had seen a pitcher of
a white powder on the back porch consisting of methamphetamine or by-products
of methamphetamine.@ 
He did not explain who told him about the pitcher.  

The record does not reflect that any officers
other than Officers Schelsteder and Gillespie went to the back door before
getting the warrant.  Officer Schelsteder
denied that either he or Officer Gillespie saw anything outside the back door
before the warrant arrived:








Q:  Now, was anything noticed at
that side of the house or outside of that door?

 

A:  No. 

The affidavit and warrant are set out here in
full:

AFFIDAVIT

THE
STATE OF TEXAS

 

 

COUNTY OF MONTAGUE

 

THE UNDERSIGNED AFFIANT,
BEING A PEACE OFFICER UNDER THE LAWS OF TEXAS AND BEING DULY SWORN, ON OATH
MAKES THE FOLLOWING STATEMENTS AND ACCUSATIONS.

 

1.     THERE IS IN MONTAGUE COUNTY, TEXAS A SUSPECTED PLACE DESCRIBED
AND LOCATED AS FOLLOWS:

 

A yellow single story, single family dwelling, located at 201
Campbell, also known as Route 1 Box 15D, in Sunset, Montague County,
Texas.  The residence is described as a
yellow wood siding house with the front facing the North.  The residence has a couch located in the
front yard.  The residence is located
directly across from the AT@ intersection of Willett
and Campbell Road.  The residence has a covered
patio located in the front of it.

 

Said suspected place and premises, in addition to the foregoing
description, also includes all other buildings, structures, places, and
vehicles on said premises and within the curtilage, if said premises is a
residence, that are found to be under the control of the suspected party named
below and in, on, or around which suspected party may reasonably reposit or
secrete property that is the object of the search requested herein.

 








2.     SAID SUSPECTED PLACE IS IN CHARGE OF AND CONTROLLED BY EACH OF
THE FOLLOWING NAMED PARTIES (HEREAFTER CALLED ASUSPECTED PARTY@ WHETHER ONE OR MORE) TO
WIT:

 

Frankie Dean Pair, Jr., a
white male, date of birth 03/22/1975, Texas driver=s license # [. . . ];

 

Gregory Don Barnes, a
white male, date of birth 02/26/1971, Texas driver=s license # [. . . ;]

 

Melba LaVerne Lowrance, a
white female, date of birth 08/26/1957, Texas driver=s license # [. . . ;]

 

Laurie Kay Vanderhee, a
white female, date of birth 07/09/1973, Texas driver=s license # [. . . ;]

 

Stacie Lee Tackett, a
white female, date of birth 11/07/1970, Texas driver=s license # . . .

 

And
others who are unknown to your affiant.

 

3.     IT IS THE BELIEF OF AFFIANT, AND AFFIANT HEREBY CHARGES AND
ACCUSES THAT SAID SUSPECTED PARTY HAS POSSESSION OF AND IS CONCEALING AT SAID
SUSPECTED PLACE IN VIOLATION OF THE LAWS OF TEXAS THE FOLLOWING DESCRIBED
PERSONAL PROPERTY, TO WIT:

 

a.      books, records, sales and/or purchase invoices, receipts,
notes, ledgers, bank records, money orders and/or other papers relating to the
transportation, ordering, sale, manufacture, and distribution of illegal
controlled substances and/or records relating to the receipt and/or disposition
of the proceeds from the distribution of illegal controlled substances.  

 

b.     currency, financial instruments, precious metals, jewelry,
and/or other items of value and/or proceeds of drug transactions and evidence
of financial transactions relating to obtaining, transferring, laundering,
secreting or spending large sums of money made from engaging in illegal
controlled substance activities.

 








c.      telephone or telephone recording devices, telephone and address
books or papers which reflect names, addresses and/or telephone numbers of
individuals associated in dealing or in the transportation of illegal
controlled substances.

 

d.     Computer hardware-Computer hardware consists of all equipment
which can collect, analyze, create, display, convert, store, conceal, or
transmit electronic, magnetic, optical, or similar computer impulses or
data.  Hardware includes (but is not
limited to) any data processing devices (such as central processing units,
memory typewriters, and self-contained Alaptop@ or Anotebook@ computers); internal and peripheral storage
devices (such as fixed disks, external hard disks, floppy disk drives and
diskettes, tape drives and tapes, optical storage devices, transistor-like
binary devices, and other memory storage devices); peripheral input/output
(such as keyboards, printers, scanners, plotters, video display monitors, and
optical readers); and related communications devices (such as modems, cables
and connections, recording equipment. 
RAM or ROM units, acoustic couplers, automatic dialers, speed dialers,
programmable telephone dialing or signaling devices, mechanisms, or parts that
can be used to restrict access to computer hardware (such as physical keys and
locks).

 

Computer Software-Computer software is digital information, which can
be interpreted by a computer and any of its related components to direct the
way they work.  Software is stored in
electronic, magnetic, optical or other digital form.  It commonly includes programs to run
operating systems, applications (like word-processing, graphics, or spreadsheet
programs), utilities, compilers, interpreters, and communication programs.

 

Computer Documentation-Computer related documentation consists of
written, recorded, printed, or electronically stored material, which explains
or illustrates how to configure or use computer hardware, software, or other
related items.  

 








Passwords and Data Security-Computer passwords and other data security
devices are designed to restrict access to hide computer software,
documentation, or data.  Data security
devices may consist of hardware, software, or other programming code.  A password (a string of alphanumeric
characters) usually operates as a sort of digital key to Aunlock@ particular data security
devices.  Data security hardware may
include encryption devices, chips, and circuit boards.  Data security software or digital code may
including programming code that creates Atest@ keys or Ahot@ keys which perform certain pre-set security
functions when touched.  Data security
software or code may also encrypt, compress, hide, or Abooby-trap@ protected data to make
it inaccessible or unusable, as well as reverse the process to restore it.

 

e.      photographs of individuals, property and illegal controlled
substance.

 

f.      materials used in the packaging, cutting, weighing,
transporting, and distributing illegal controlled substance.

 

g.     surveillance devices such as outside/inside mounted video
cameras, television monitors, police scanners, Abody bug@ detectors, night vision
equipment, spotting scopes, binoculars, or any other devices used to detect the
presence of law enforcement officers.

 

g.[sic] any controlled
substances in violation of the Texas Health and Safety Code to include but
limited to methamphetamine.

 

4.     AFFIANT HAS PROBABLE CAUSE FOR THE SAID BELIEF BY REASON OF THE
FOLLOWING FACTS, TO WIT:

 








A.     Your Affiant, Marshall Thomas, is a commissioned peace officer
under the laws of the State of Texas and has been employed by the Texas
Department of Public Safety for over thirteen (13) years, and for the past five
(12) months has been assigned to the Narcotics Service as a
Sergeant/Investigator, stationed in Wichita Falls, Wichita County, Texas.  Affiant has had training in the investigation
of narcotics violations, handling of informants, recognition of controlled
substances, debriefing defendants, participant witnesses, and other persons who
have personal knowledge of the amassing, spending, converting, transporting,
distributing, laundering, and concealing of proceeds of narcotics trafficking.

 

B.     The grounds for issuance of this warrant are derived from review
of reports, surveillance, physical evidence, and discussions with
investigators.  Based on my experience
and training I know the following:

 

1.     Individuals who deal in
illegal controlled substances maintain books, records, receipts, notes,
ledgers, bank records, money orders and other papers relating to the
manufacture, transportation, ordering, sale and distribution of illegal
controlled substances;

 

2.     Individuals who deal in
illegal controlled substances routinely conceal in their residences caches of
illegal controlled substances, large amounts of currency, financial
instruments, precious metals, jewelry and other items of value and/or proceeds
of illegal controlled substance transactions relating to obtaining,
transferring, secreting or spending large sums of money from engaging in
illegal controlled substances activities;

 

3.     It is common for
individuals who deal in illegal controlled substances to secrete contraband,
proceeds of drug sales and records of drug transactions in secure locations
within their residences and/or motor vehicles for ready access and to conceal
such item[s] from law enforcement authorities;

 

4.     Individuals who deal in
illegal controlled substances profit from the sale of illegal controlled
substances and they attempt to legitimize these profits.  To accomplish these goals, these individuals
utilize false and fictitious business records, foreign and domestic banks,
securities, cashiers checks, money drafts, letters of credit, brokerage houses,
real estate, shell corporations, and business fronts.

 








5.     Individuals who deal in
illegal controlled substances commonly maintain address or telephone numbers in
books or papers which reflect names, addresses and/or telephone numbers for
their associates in their illegal organization. 
In addition, these individuals utilize telephone systems to maintain
contact with their associates in their illegal business.  These telephones are often in the primary
location of these individual=s illegal businesses.

 

6.     Individuals who deal in
illegal controlled substances take or cause to be taken, photographs of
themselves, their associates, their property and their illegal product.  These individuals usually maintain these
photographs in their possession or at their residences.

 

7.     Individuals who deal in
illegal controlled substances usually keep paraphernalia for packaging,
cutting, weighing, and distributing illegal controlled substances.  This paraphernalia includes scales, plastic
bags, and cutting agents.

 

8.     Individuals who deal in
illegal controlled substances or individuals who reap substantial profits from
providing the raw materials and equipment utilized in illegal conduct, commonly
violate State and Federal laws by attempting to conceal the true amount and
source of their income from the government.

 

C.     Your affiant states that the facts which establish probable
cause necessary for the issuance of a search warrant for the above described
premises are based on the following facts:

 

On or about 10/17/2002, your affiant was advised by Montague County
Sergeant Investigator Dan Jordan that he had received information from a
confidential informant that the occupants that were residing at 201 Campbell in
Sunset, Texas were believed to be manufacturing methamphetamine.  The informant stated that the informant had
smelled ether coming from the residence on more than one occasion and had seen
several subjects that the informant knows to be associated with the manufacture
of methamphetamine.

 








On about 12/15/02, Montague County Deputies Mark Robertson and Gary
Studebaker went to the residence in order to serve a warrant on a subject.  While at the front door, Deputies smelled a
strong odor of ether coming from about the residence.  The Deputies knew that ether is a known
ingredient in the manufacture of Methamphetamine and the owner of the residence
is associated with known drug dealers and users.  The owner of the residence would not give
consent to search the residence.

 

On this date, Deputies with the Montague County Sheriff=s Office went to the
residence in order to serve a felony arrest warrant on a subject who was
reported to be inside.  While at the
residence, Deputies smelled a strong chemical odor that they know, due to their
experience and training as law enforcement officers, to be associated with the
Manufacture of Methamphetamine.

 

WHEREFORE, AFFIANT ASKS
FOR ISSUANCE OF A WARRANT THAT WILL AUTHORIZE THE SEARCH OF SAID SUSPECTED
PLACE FOR SAID PERSONAL PROPERTY AND SEIZE THE SAME AND TO ARREST EACH SAID
SUSPECTED PARTY, AND TO TAKE CUSTODY OF ALL SEIZED PROPERTY AND SAFEKEEP SUCH
PROPERTY AS PROVIDED BY STATUTE.

 

The warrant itself
provides,

 

 

SEARCH WARRANT

 

 

THE STATE OF TEXAS

 

COUNTY OF MONTAGUE

 

 

THE STATE OF TEXAS to the Sheriff or any Peace Officer of Montague County,
Texas or any Peace Officer of the State of Texas.

 

GREETING:

 








WHEREAS, the Affiant whose name appears on the attached affidavit is a
Peace Officer under the laws of Texas and did heretofore this day subscribe and
swear to said Affidavit before me (which said Affidavit is here now made part
hereof for all purposes), and whereas I find that the verified facts stated by
Affiant in said Affidavit show that Affiant has probable cause for the belief
expressed therein and establish existence of proper grounds for Issuance of
this Warrant; now, therefore, you are commanded to enter the suspected place
described in said Affidavit an [sic] to there search for the personal property
described in said Affidavit and to seize same and to arrest and bring before me
each suspected party named in said Affidavit.

 

Further, you are ORDERED, pursuant to the provisions of Article 18.10,
Texas Code of Criminal Procedure, to retain custody of any property seized
pursuant to this Warrant, until further order of this Court or any other court
of appropriate jurisdiction shall otherwise direct the manner of safekeeping of
said property.  This court grants you
leave and authority to remove such seized property from this county, if and
only if such removal is otherwise authorized by the provisions of Article
18.10, T.C.C.P.  You are further ORDERED
to give notice to this Court, as a part of the inventory to be filled [sic]
subsequent to the execution of this Warrant, and as required by Article 18.10,
T.C.C.P. of the place where the property seized hereunder is kept, stored and
held.

 

HEREIN FAIL NOT, but have you then and there this Warrant within three
days, exclusive of the day of its issuance and exclusive of the day of its
execution, with your return thereon, showing how you have executed the same,
filed in this court.

 

ISSUED THIS THE 01st day of March, A.D., 2003, at 12:12 o=clock A.M. to
certify which witness my hand this day.

 

Larry
Sanders

MAGISTRATE

 








The affidavit provides that on October 17, 2002,
the officers had received information from a confidential informant that the
occupants residing at 201 Campbell in Sunset, Texas, were believed to be
manufacturing methamphetamine.  The
informant stated that he had smelled ether coming from the residence on more
than one occasion and had seen several persons whom the informant knew to be
associated with the manufacture of methamphetamine.  The record does not reflect the names of
these persons, nor does it explain why the unnamed informant is worthy of
belief.  

On December 15, 2002, the affidavit further
provides, Montague County Deputies Mark Robertson and Gary Studebaker went to
the residence to serve a warrant on an unnamed subject.  They smelled ether coming from the
residence.  The deputies knew that ether
is a known ingredient in the manufacture of methamphetamine and that the owner
of the residence was associated with known drug dealers and users.  The owner of the residence, however, is not
named in the affidavit.  Finally, the
affidavit in support of the March 1 warrant was not signed until March 1, 2003,
after the police had already entered the house and, as we discuss below, after
they had already arrested Appellant.       








The record does not reflect the presence of
ether.  After receiving the search
warrant, the officers returned to the bathroom to retrieve liquid from the
toilet.  Clear liquid was also found in a
syringe in a kitchen drawer and in another syringe located in a coat on the
couch.  Powdered methamphetamine was
found in the kitchen inside a box with a syringe of clear liquid.  More powdered methamphetamine was found on
the back porch and in a coffee filter. 
The officers found pseudoephedrine still in blister packs on a counter
in the living room and a clear liquid in an acetone bottle in a kitchen
cabinet.  

Legal Analysis 

The issues in this case are the validity of law
enforcement actions taken before the search and arrest warrant was obtained,
that is, the initial entrance into the house and the detention and search of
Appellant, the validity of the warrant, and the attenuation of the taint of any
illegal arrest and search on the subsequent seizure of evidence after the
warrant was obtained.

The Warrantless Entry








Under state law, an officer may not enter a
residence to make a warrantless arrest unless (1) the Aarrest
may be lawfully made without warrant,@ and
(2)(a) a resident consents to the entry, or (b) there are exigent
circumstances.[1]  Before an appellate court can consider
whether the officers had authority to enter the residence under Article 14.05,
the court must first determine whether the initial arrest could be lawfully
made without a warrant.[2]       The
officers in the case before us went to the house to execute a felony warrant on
a woman who was not found at the house. 
The record is silent as to who owned or lived in the house.  The record is also silent as to the nature of
the offense for which the woman was to be arrested.  Despite the contrary language of the
affidavit, there is no indication that anyone refused permission for a
consensual search.  

The officers said that they smelled the odor of
ether that they associated with a methamphetamine lab, but no ether was
discovered at the scene.  The record
reflects that the methamphetamine lab in question involved the manufacture of
crystal methamphetamine, which requires only three main ingredients:  pseudoephedrine, iodine crystals, and red
phosphorus.[3]  That is, ether is not required to make
crystal methamphetamine. The newer, small methamphetamine labs, unlike the
older labs, are often impossible to detect by smell.[4]








Even if the officers smelled ether or, even if,
contrary to the testimony of the officers on the scene, they did see the
pitcher with methamphetamine outside on the back porch before entering the
house, the mere presence of drugs or a drug precursor could not justify the
warrantless entry.  The pitcher does not
provide the exigent circumstance to justify entering the house without a
warrant.  Nor is its existence listed in
the warrant as an element of probable cause to believe drugs were inside the
house.  Certainly it created no
justification to believe that anyone would destroy the methamphetamine in the
pitcher outside the house if the officers did not immediately enter the house
and seize those inside.  

The officers and the majority contend that the
warrantless entry was made to protect drugs from destruction.  Yet, the officers only suspected that drugs
might be present because they smelled ether, and, apparently, had smelled ether
since October of the previous year.  The
only justification for their assuming that drugs would be destroyed was that
they heard movement inside the house. 
Drugs, by their very nature, are almost always easily destroyed or
consumed.  To hold that the nature of
drugs provides automatic exigent circumstances to justify a warrantless entry
raises grave constitutional questions. 
This is especially true in light of the facts of the case now before
this court.  








The record makes clear that the only reason the
officers believed that the drugs they suspected were inside the house would be
destroyed or consumed was that the officers were surrounding the house and
demanding that the door be opened. 
Police officers, however, may not themselves create the exigent circumstances.  As the Supreme Court of the United States has
held repeatedly, AExigent circumstances, however,
do not pass Fourth Amendment muster if the officers deliberately create them.@[5]  In the case now before this court, the
officers had only to retreat, surreptitiously keeping the house under
surveillance, until the warrant could be secured.  Of course they could only obtain a valid
warrant if they had some basis for probable cause.

The majority=s
conclusion that the mere presence of drugs justifies a warrantless entry into a
home has been rejected by the Supreme Court of the United States.[6]  Texas
case law dealing with no-knock warrants has also addressed the sufficiency of
exigent circumstance evidence.  As our
sister court in Houston has explained,








Although the experienced
officer may surmise that a party is likely to dispose of evidence when faced
with the execution of the search warrant, such suspicions do not create an
exigency to justify an unannounced entry. . . . To avail themselves of this
exception to the knock‑and‑announce rule, officers must reasonably

 conclude that the resident has resolved to
dispose of the evidence in the event of police intrusion. . . .  The police should have at least some specific
facts as to the case at hand that would justify their apprehension. . . .  The mere fact that drugs are involved does
not give the police probable cause to believe that evidence will be destroyed
so as to justify an unannounced entry.[7]

 

The Texas Court of Criminal Appeals has also
discussed the insufficiency of an odor to provide probable cause to justify a
warrantless search,

This Court has recognized
that Aodors alone do not
authorize a search without a warrant.@  Why,
then, did the officers burst into the house? 
What offense, if any, did they observe Ian committing?  The State argues that given the anonymous tip
and the odor of burned marijuana, the officers had probable cause to believe an
offense, possession of marijuana, had been committed in their presence.  We disagree.

 

First of all, a mere anonymous tip, standing alone, does not
constitute probable cause.  In this case,
the tip, that someone at the residence was dealing drugs, did not amount to
anything.  The tip was never
substantiated, and none of the occupants were ever charged with drug dealing.

 








Second, the mere odor of burning marijuana did not give the officers
probable cause to believe that Ian had committed the offense of possession of
marijuana in their presence.  The odor of
marijuana, standing alone, does not authorize a warrantless search and seizure
in a home.  An arresting officer must
have specific knowledge to believe that the person to be arrested has committed
the offense.  Professor LaFave explains:

 

[T]he detection of the
odor of marijuana in a certain place will not inevitably provide probable cause
to arrest a person who is at that place. 
Illustrative is People v. Harshbarger, where police, upon
detecting the strong smell of burning marijuana in a house, arrested all four
of the men found therein, resulting in the discovery of amphetamines on the
person of a guest.  The court could Afind no justification for
defendant=s arrest at the time it
was made, nor for the search of his person occurring sometime subsequent
thereto at the stationhouse.  The
officers had never seen or heard of defendant before.  He was merely one of four persons sitting in
the living room of a house in which the officers thought they smelled burning
marijuana.  They had no idea which one of
them, or for that matter, if any of them had actually been smoking
marijuana.  Nor did defendant by his
actions, furtive or otherwise, give any indication that he may have been
violating the law.  In effect, defendant=s arrest was prompted by
a mere suspicion that someone must have been smoking marijuana because of the
odor believed to be present, and therefore, the best thing to do was arrest and
search everybody.@

 

     W. LaFave, Search and Seizure ' 3.6(b) (1996 & Supp.
2002).[8]

 








If the mere presence of drugs without more will
not justify an unannounced entry when a magistrate has issued a warrant
authorizing entry, how much more offensive is entry without a warrant when the
entry is justified only by the mere presence of drugs.  A[T]he
presence of drugs alone does not give rise to exigent circumstances justifying
a warrantless entry and search.@[9]  AWhen the right of
privacy must reasonably yield to the right of search is, as a rule, to be
decided by a judicial officer, not by a policeman or government enforcement
agent.@[10]

Based on Steelman and article 14.05 of the
Texas Code of Criminal Procedure, I would hold that Appellant could not have
been lawfully arrested at the time of the officers= entry
into the home.  No probable cause
supported the warrantless arrest.[11]  Because the police could not have lawfully
arrested Appellant at that time under any exception to the warrant requirement,
Athey had
no authority (under article 14.05) to enter the residence without a warrant and
conduct a search, and any evidence seized as a result of those illegalities was
tainted and subject to suppression.@[12]         








The majority contends that the officers did not
enter the house in order to arrest those inside, but, rather, to protect the
alleged contraband.  The officers knew
there were persons or other live beings inside the house.  They only suspected that there was contraband
inside.  The first thing the officers did
was to seize and handcuff the persons inside the house.  According to their own testimony, they did
not search for or seize any evidence until after they obtained the
warrant.  

Even if there had been probable cause to believe
that a crime was being committed, as the majority contends, probable cause is
only half the equation.  Probable cause
is necessary to obtain a warrant.[13]  Warrantless entry into a house is justified
only if there are both articulable exigent circumstances (absent consent) and
probable cause.[14]  No amount of probable cause can justify a
warrantless search where the State has not met its burden of showing exigent
circumstances to the warrant requirement.[15]  








The majority appears to contend that the general
need to protect the alleged contraband provided exigent circumstances.  But under the law of both the United States
and Texas, the State failed to prove any specific, articulable exigent
circumstances that would have justified the warrantless entry into the
house.  Nothing in the record tells us
how long the odor of ether emanated from the house.  The record does tell us that Officer Thomas
had known of drug manufacturing in the house for an extended period of
time.  What created the emergency on the
night in question?  What additional
probable cause arose?  What exigency
required the warrantless entry?  The
State showed no evidence to justify the search and seizure except the drugs
found after entering the house.  The
officers did not consider the pitcher on the back porch to be threatened with
destruction because they did not seize it or even notice it until after seizing
the persons inside the house.   

Even though Officer Thomas had been watching the
house for some time and believed that drugs were being manufactured there, he
sought no warrant until after the other officers forced their way into the
house, handcuffed and searched the persons found there, put them into squad
cars, walked through every room in the house, and observed those items in plain
view, if the testimony of the officers on the scene is believed in its totality.

Because the State did not prove either probable
cause or exigent circumstances but only the mere belief that drugs were
present, I would hold the entry into the home unlawful.  I must therefore respectfully dissent from
the majority=s opposite holding. 

The Warrantless Arrest








Appellant=s
detention was also unlawful.  When the
officers first entered the house, they seized Appellant and the other persons
present in the house.  One man was
attempting to pour a clear liquid into the toilet when the officers seized
him.  Officer Schelsteder, who referred
to Appellant and the other handcuffed persons as Aprisoners@
awaiting transport, nevertheless denied that they were under arrest.  As Texas Code of Criminal Procedure article
15.22 provides, 

A person is arrested when he has been actually placed under restraint
or taken into custody by an officer or person executing a warrant of arrest, or
by an officer or person arresting without a warrant.[16]

 








The Texas Court of Criminal Appeals has stated, AAn
arrest is complete whenever a person's liberty of movement is restricted or
restrained.@[17] 
Appellant was not free to leave, and the officers were waiting for the
arrest warrant that they eventually relied on to justify the detention.  I would hold that Appellant was under arrest
when the officers handcuffed him and placed him in the police car.  Officer Schelsteder denied that he saw
Appellant commit a crime in his presence and admitted that the search of the
suspects= persons
uncovered neither weapons nor contraband. 
Because there was no legal basis for Appellant=s arrest
at that time, the arrest, like the entry into the home, was illegal.

The majority contends that Appellant does not
challenge his seizure but only the search. 
I disagree.  When the officers
seized and handcuffed Appellant, they searched him.  The search was a product of the seizure of
his body.  The officers went through the
house and viewed various items in the house. 
All of these actions directly resulted from the unlawful, warrantless
entry.  The fact that the police used the
fruits of the search of Appellant=s person
only to identify him in the search warrant makes no legal difference.  The evidence was illegally obtained and
should have been suppressed.

Attenuation of the Taint

In determining whether the subsequently issued
search and arrest warrant attenuated the taint of the unlawful entry and
initial arrest, we should employ  the
Brown factors:[18]

1) whether Miranda warnings were
given;  

2) the temporal proximity
of the [illegal] arrest and the [search and seizure]; 

 

3) the presence of intervening
circumstances;  and particularly, 








4) the purpose and flagrancy of the official
misconduct.[19]

Primary among the factors in this case is the lawfulness of the
subsequently obtained warrant.[20]  The Texas Court of Criminal Appeals has Arecognized
that even if an illegal warrantless arrest taints subsequently acquired
evidence, such evidence need not be suppressed if the State can show that the
taint has been attenuated (e.g., by an otherwise valid search warrant).@[21]  








In this case, the subsequent warrant was a
combination search and arrest warrant. 
Because the issue before this court is whether the subsequently-obtained
warrant attenuated the taint of the warrantless entry and seizure of Appellant,
we look beyond the four corners of the affidavit to resolve the attenuation
issue.[22]  But, because there are no Franks[23] allegations, we look only to the four
corners of the affidavit to determine the secondary issue of the warrant=s
validity.[24]                                                                    

The arrest portion of the warrant is flawed in
substance and form.  Article 15.02 of the
Texas Code of Criminal Procedure sets out the requirements of a lawful arrest
warrant.[25]  This article provides that the warrant Amust
state that the person is accused of some offense against the laws of the State,
naming the offense.@[26] 
Although the warrant incorporates the affidavit by reference, neither
the warrant nor the supporting affidavit states that Appellant is accused of a
specific offense against the laws of Texas.                

The officers clearly used a form affidavit that
contains multiple alternative allegations. 
The affiant chose to swear to all the alternatives.  The closest the affiant gets to accusing
Appellant of a specific offense against the laws of Texas is his allegation
that 

IT IS THE BELIEF OF
AFFIANT, AND AFFIANT HEREBY CHARGES AND ACCUSES THAT SAID SUSPECTED PARTY HAS
POSSESSION OF AND IS CONCEALING AT SAID SUSPECTED PLACE IN VIOLATION OF THE
LAWS OF TEXAS THE FOLLOWING DESCRIBED PERSONAL PROPERTY, TO WIT: . . .

 








g. surveillance devices
such as outside/inside mounted video cameras, television monitors, police
scanners, Abody bug@ detectors, night vision
equipment, spotting scopes, binoculars, or any other devices used to detect the
presence of law enforcement officers.

 

g.[sic] any controlled
substances in violation of the Texas Health and Safety Code to include but
limited to methamphetamine.

 

Additionally, there is insufficient evidence to
show probable cause within the four corners of the affidavit.  The evidence the affiant points to as Aprobable
cause@ for his
belief that the enumerated items would be found inside the house is his
training and experience; the fact that individuals who deal in illegal drugs
have these items; his Areview of reports, surveillance,
physical evidence, and discussions with investigators@; and 

On or about 10/17/2002, your affiant was advised by Montague County
Sergeant Investigator Dan Jordan that he had received information from a
confidential informant that the occupants that were residing at 201 Campbell in
Sunset, Texas were believed to be manufacturing methamphetamine.  The informant stated that the informant had
smelled ether coming from the residence on more than one occasion and had seen
several subjects that the informant knows to be associated with the manufacture
of methamphetamine.

 

On about 12/15/02, Montague County Deputies Mark Robertson and Gary
Studebaker went to the residence in order to serve a warrant on a subject.  While at the front door, Deputies smelled a
strong odor of ether coming from about the residence.  The Deputies knew that ether is a known
ingredient in the manufacture of Methamphetamine and the owner of the residence
is associated with known drug dealers and users.  The owner of the residence would not give
consent to search the residence.








On this date, Deputies with the Montague County Sheriff=s Office went to the
residence in order to serve a felony arrest warrant on a subject who was
reported to be inside.  While at the
residence, Deputies smelled a strong chemical odor that they know, due to their
experience and training as law enforcement officers, to be associated with the
Manufacture of Methamphetamine.

 

The Texas Court of Criminal Appeals has explained,

Probable cause to support the issuance of a
search warrant exists where the facts submitted to the magistrate are
sufficient to justify a conclusion that the object of the search is probably on
the premises to be searched at the time the warrant is issued.  Where facts and circumstances within the
knowledge of a police officer, arising from a reasonably trustworthy source,
would warrant a man of reasonable caution in the belief that items of
contraband or evidence of a crime may presently be found in a specified place,
there is probable cause to issue a warrant to search that place.  A search warrant affidavit must be read in a
commonsense and realistic manner, and reasonable inferences may be drawn from
the facts and circumstances contained within its four corners.[27]  

There are several ways in which the portion of
the warrant authorizing the search lacks a foundation of probable cause:








$                  
Although the affidavit states that the suspect
house is under the control of five persons, listing their names, dates of
birth, and driver=s license numbers, nothing in
the record reflects any source of this information other than the discovery of
the five people and the warrantless search of those persons when the police
entered the residence without a warrant, that is, the affidavit necessarily
depends on the illegally seized evidence. 

$                  
The warrant otherwise depends on stale,
nonspecific information obtained from a confidential informant that does not
tie Appellant to the evidence or to the ownership of the house.  Nothing in the record shows why the unnamed
informant is worthy of belief or any basis for or source of the informant=s
information.

$                  
The record does not reflect who the owner of the
Campbell Street residence was in October, December, or March.        

$                  
The record does not reflect that the persons in
the residence on March 1, 2003, were the same people as those who were in the
house in October or December 2002 or that they were associated with those
people.

$                  
The record does not reflect the age of the odor
of ether or chemicalsCthat is, whether the odor
lingered from earlier activities, especially in light of the fact that no
chemicals were found in the house that could have produced the odor of
ether.  As for the allegation that
officers smelled a chemical odor associated with the manufacture of
methamphetamine, testimony revealed that this chemical odor was that of
ether.  Yet this same odor was reported
in October and in December.  That is, it
was reported over a period of more than four months.








$                  
The affidavit refers to surveillance, yet the
record reflects no surveillance.  Nothing
in the record reflects any attempt to verify the tips or to learn the identity
or identities of any owner or occupant of the house.  The record does not reflect that before the
illegal entry, anyone searched the trash for evidence of the manufacture of
methamphetamine, made a buy, entered the house and saw evidence of contraband,
or watched traffic to and from the house. 
Indeed, the first confirmation of the existence of contraband or drug
paraphernalia occurred when the officers entered the house.

$                  
Again, the affidavit in support of the warrant
was not signed until March 1, 2003, after the illegal arrest and illegal
entry.  








In summary, the original warrantless entry into
the house was unlawful, as was the seizure of Appellant.  The subsequent warrant did nothing to
attenuate the taint because the affidavit did not provide probable cause for
the issuance of the warrant without information obtained during the original
unlawful entry.  That is, the warrant was
not valid.  The majority concedes that
probable cause ceases to exist when it is no longer reasonable to presume that
items once located in a specified place are still there.  Nothing in the affidavit and nothing in the
record suggests that the persons and objects inside the house on March 1, 2003,
were the same persons and objects that were inside the house in October and
December 2002.  The affidavit does not
state that the affiant checked any records to determine who lived in the house
in October, December, or March.  The
confidential informant either did not name the persons or Officer Thomas
omitted the names from that portion of the affidavit.  Nothing in the affidavit provides any
information about what was going on in the house on March 1, 2003, beyond the
smell of ether and the information obtained in the warrantless entry.  None of the information provided by the
unnamed informant was corroborated by Officer Thomas.  We have no idea why the information should be
considered credible.  Additionally, it
should be noted that the affidavit contains no reference to the pitcher of
methamphetamine found on the porch, and the officers on the scene denied seeing
it until after they obtained the warrant.








The other factors similarly did nothing to
attenuate the taint.  There is no
evidence in the record that Appellant was Mirandized.[28] 
Additionally, while the time period between the initial arrest and entry
and the search and seizure authorized by the warrant exceeded two hours,
nothing happened during that time to attenuate the taint; law enforcement
guarded the house and its occupants during the entire period.  Finally, the officers=
misconduct here does not appear to be accidental or perchance; it pervades the
entire episode.       I would hold that the warrant should not have issued on the
basis of the affidavit because it was inadequate as a matter of law and relied
on the fruits of the warrantless entry. 
I would therefore hold that the taint of the illegal arrest and entry
was not attenuated.  Consequently, I
would hold that the trial court erred by denying Appellant=s motion
to suppress. For all of the above reasons, I must respectfully dissent from the
majority opinion.

 

LEE
ANN DAUPHINOT

JUSTICE

 

 

PUBLISH

 

DELIVERED:  January 5, 2006

 











[1]The dissent provides a
different view of the factual events and their timing, not viewing the
historical facts in the light most favorable to the trial court=s ruling.





[2]The items Pair seeks to
suppress were found in the residence, not on Pair=s person.





[3]The Supreme Court has
expressed the probable cause standard as follows:

 

[P]robable cause is the
sum total of layers of information and the synthesis of what the police have
heard, what they know, and what they observe as trained officers.  We weigh not individual layers but the
"laminated total . . . [.]"  In
dealing with probable cause, . . . as the very name implies, we are dealing
with probabilities.  These are not
technical;  they are the factual and
practical considerations of everyday life on which reasonable and prudent men,
not legal technicians, act.  

 

McNairy, 835 S.W.2d at 106
(quoting Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302,
1311 (1949)).





[4]The dissent raises issues
that were not asserted by Pair in his brief. 
Having no discretion to consider unassigned error, we decline to
entertain those lines of argument.  See
Rezac v. State, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).





[1]Tex. Code Crim.
Proc. Ann.
art. 14.05 (Vernon 2005).





[2]See id. arts. 14.01-.05.





[3]See, e.g., Tex. Health & Safety Code Ann. ' 481.124(b)(3)(B)(i)
(Vernon Supp. 2005); Gregory v. State, 159 S.W.3d 254, 258 (Tex. App.CBeaumont 2005, pet. ref=d); Fulfer v. State,
2005 WL 735012, at *2 (Tex. App.CEl Paso Mar. 31, 2005, pet. ref=d) (not designated for
publication).





[4]See, e.g., Marilyn Berlin Snell, Welcome
to Meth Country, Sierra, Jan.
2001, at 50-54, available at
http://www.sierraclub.org/sierra/200101/Meth.

asp; Mark Arax & Tom
Gorman, California=s Illicit Farm Belt Export, L.A. Times, Mar. 13, 1995, at A1, available
at http://www.luckytown.org/tgotj/sc.txt. 





[5]United States v. Richard,
994 F.2d
244, 247 (5th Cir. 1993); see also United States v. Webster, 750 F.2d
307, 327 (5th Cir. 1984), cert. denied, 471 U.S. 1106 (1985). 





[6]Johnson v. United States, 333 U.S. 10, 14, 68 S.
Ct. 367, 369 (1948); see also United States v. Howard, 106 F.3d 70, 74
(5th Cir. 1997) (AAt the outset, we note
that the presence of drugs alone does not give rise
to exigent circumstances justifying a warrantless entry and search.@).





[7]Price v. State, 93 S.W.3d 358, 368
(Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d) (op. on reh=g).





[8]State v. Steelman, 93 S.W.3d 102, 108-09
(Tex. Crim. App. 2002) (footnotes and citations omitted).





[9]Howard, 106 F.3d at 74.





[10]Johnson, 333 U.S. at 14, 68 S.
Ct. at 369.





[11]Johnson v. State, 871 S.W.2d 744, 748
(Tex. Crim. App. 1994).





[12]See Steelman, 93 S.W.3d at 109.





[13]Tex. Code Crim.
Proc. Ann.
art. 18.01(b) (Vernon 2005).





[14]Estrada v. State, 154 S.W.3d 604, 609
(Tex. Crim. App. 2005).





[15]See, e.g., Coolidge v. New
Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971); Vale v.
Louisiana, 399 U.S. 30, 34-35, 90 S. Ct. 1969, 1971-72 (1970); Katz v.
United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967); Johnson,
333 U.S. at 13-15, 68 S. Ct. at 369.





[16]Tex. Code Crim.
Proc. Ann.
art. 15.22 (Vernon 2005).





[17]Medford v. State, 13 S.W.3d 769, 773 (Tex.
Crim. App. 2000).





[18]Brown v. Illinois, 422 U.S. 590, 603-04,
95 S. Ct. 2254, 2261-62 (1975).  





[19]Johnson, 871 S.W.2d at 750-51.





[20]Steelman, 93 S.W.3d at 106-07; Bell
v. State, 724 S.W.2d 780, 791 (Tex. Crim. App. 1986), cert. denied,
479 U.S. 1046 (1987).





[21]Steelman, 93 S.W.3d at 106-07; see
also Johnson, 871 S.W.2d at 750-51.





[22]See Johnson, 871 S.W.2d at 750.





[23]Franks v. Delaware, 438 U.S. 154, 98 S. Ct.
2674 (1978).





[24]Ramsey v. State, 579 S.W.2d 920, 921
(Tex. Crim. App. [Panel Op.] 1979).





[25]Tex. Code Crim.
Proc. Ann.
art. 15.02 (Vernon 2005).





[26]Id.





[27]Cassias v. State, 719 S.W.2d 585, 587-88
(Tex. Crim. App. 1986).  

 





[28]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct.
1602 (1966).